# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

SUDAN A. HUGHES,

          Plaintiff,

    v.

CITY OF ROCHESTER, et al.,

          Defendants.

DECISION & ORDER
12-CV-6112

## PRELIMINARY STATEMENT

On February 29, 2012, Plaintiff Sudan Hughes ("plaintiff") filed a complaint for employment discrimination against the City of Rochester and the City of Rochester Fire Department ("defendants"). See Docket # 1. Plaintiff claims discrimination under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, and the Americans with Disabilities Act of 1990, codified at 42 U.S.C. §§ 12112 to 12117. Id. According to plaintiff, the discrimination based on his race, color, and disability-status resulted in a failure to provide him with reasonable accommodations so that he could perform the essential functions of his job, retaliation because he complained about the discrimination, and termination of his employment. Id. In accordance with the provisions of 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this

Court for all dispositive matters, including trial.   See Docket # 14.

Currently pending before the Court is defendants' motion for summary judgment, filed on October 2, 2015.   Docket # 20. On December 11, 2015, plaintiff filed his response (Docket # 28), and defendants replied on December 23, 2010.   Docket # 30. The Court heard oral argument on defendants' motion on February 9, 2016.   At oral argument, the parties informed the Court that they would be interested in appearing before the undersigned for a settlement conference.   On May 17, 2016, the Court conducted extended settlement conferences with both counsel and plaintiff present.   After good faith negotiations, however, the parties were unable to reach an agreement.   Accordingly, and based on the parties' submissions to the Court and argument on defendants' motion, the Court now renders its decision.   For the reasons that follow, defendants' motion for summary judgment (Docket # 20) is **granted in part** and **denied in part**.

### FACTUAL BACKGROUND

Plaintiff, an African-American male, suffers from, inter alia, "bipolar depression and episode[s] of psychosis at relevant times."   See Docket # 1-4.   According to defendants, plaintiff became a part-time firefighter trainee on September 6, 1995.   See Docket # 22 at 2.   On September 8, 1997, plaintiff

graduated from the trainee program and became a full-time firefighter.   Id.   As a firefighter, plaintiff joined the Rochester Firefighters Association, Local 1071 ("the Union"). Id.  On May 24, 2007, plaintiff was assigned to the Quint/Midi 3 fire company, where he worked fire suppression.   Id.   On December 7, 2008, plaintiff called in sick, claiming that he suffered from flu-like symptoms.   Id.   The Fire Department's protocol requires a firefighter who becomes ill outside the performance of work duties to report the absence and provide weekly updates for any extended ailments.   Id.   After reporting the illness, plaintiff was placed on paid sick leave according to the Union's Collective Bargaining Agreement.   Id.

In December 2008, however, plaintiff was hospitalized for a week not for flu-like symptoms, but for inpatient psychiatric treatment.   Id.   On December 18, 2008, plaintiff's battalion chief visited plaintiff's home to check on his status.   Id. Without disclosing the specifics of his illness, plaintiff told his battalion chief that he had been hospitalized and was unable to return to work.   Id. at 2-3.   After plaintiff went several weeks without providing updates to defendants, he was ordered to appear for a March 2, 2009 appointment with a contract medical provider, Strong Occupational and Environmental Medicine.   Id. at 3.   At the appointment, Dr. Rathin Vora, M.D., determined that plaintiff was unfit to work and requested that he return in

3

two months for another evaluation.  Id. at 3; see also Docket #
21-3.

On May 28, 2009, plaintiff's Fire Chief advised him that
his six months of paid leave would exhaust on June 30, 2009, but
that he could use his vacation time to extend his pay status to
July 1, 2009.  Docket # 22 at 3.  On June 2, 2009, plaintiff's
psychiatrist,   Dr.   Khalid   Hubeishy,   M.D.,   determined   that
plaintiff was fit to return to work on a part-time basis limited
to four hours per day.  Id.  Plaintiff then returned to Dr.
Vora, who referred plaintiff to Dr. R.P. Singh, M.D., a forensic
psychiatrist.  Id.  On July 1, 2009, after exhausting his paid
leave time, plaintiff was placed on unpaid leave.  Id.

On July 14, 2009, after conducting a number of interviews
with plaintiff and his physicians and reviewing Dr. Vora's
records, Dr. Singh issued a report recommending that plaintiff
return  to  work  on  a  part-time  basis  with  a  number  of
restrictions and conditions.  Docket # 28-7.  In the report, Dr.
Singh   diagnosed   plaintiff   with:   Psychotic   Disorder,   not
otherwise specified and possibly in early remission; Bipolar I
Disorder with manic and psychotic features in early remission;
and stress related to the workplace.  Id. at 4.  Dr. Singh also
concluded   that   plaintiff   may   suffer   from   Delusional   or
Adjustment Disorders.  Id.  Dr. Singh expressed concern over
plaintiff's paranoia - and, particularly, his paranoia directed

4

at his work supervisors – but felt that his symptoms were not severe enough to impact his attempt at returning to work.  Id. Indeed, he opined that plaintiff was compliant with treatment and "in fairly good remission," but expressed uncertainty about the future course of plaintiff's illness.  Id.  Based on his assessment, Dr. Singh concluded that plaintiff was able to return to work on a part-time basis so long as there was a mechanism to ensure that he remained fully compliant with his treatment and his supervisors monitored his behavior and functioning for signs of relapse.  Id. at 5.  Based on Dr. Singh's report, Dr. Vora cleared plaintiff to return to work part-time – though not as a line firefighter – with a number of restrictions.  In his July 27, 2009 recommendation, Dr. Vora wrote:

> 1) Mr. Sudan Hughes may return to work on a part-time basis at this time. This should be conditional that he demonstrates appropriate follow up with his treating providers in the form of a letter/note regarding his compliance with treatment.
>
> 2) Mr. Hughes should not be doing active on-line duty at this time, but may be able to work part-time on light duty only.
>
> 3) His supervisors should be notified that if they notice any change in his behavior, he should be re-evaluated immediately.
>
> 4) He should follow up in our clinic approximately after three months of part-time light duty work.

Docket # 28-8.

Despite the approval from Dr. Singh and Dr. Vora, defendants did not permit plaintiff to return to work. Docket # 22 at 4. According to Fire Chief Salvatore Mitrano ("Mitrano"), defendants' representative who made the decision, there were no light-duty assignments that plaintiff could perform based on the restrictions proposed by Dr. Singh and Dr. Vora. See Docket # 23 at 4. In testimony before an Administrative Law Judge with the New York State Division of Human Rights, Mitrano said that he declined to reinstate plaintiff because no position existed where his supervisors would be able to sufficiently monitor his behavior for changes related to his mental illness. Id.

Plaintiff was eventually terminated from his position on December 15, 2009 pursuant to Civil Service Law section 73. Docket # 22 at 4; see also Docket # 28-10. From February 23, 2010 to March 8, 2010, plaintiff was admitted to Buffalo General Hospital for inpatient psychiatric treatment following a period of "paranoid" and "bizarre" behavior. Id.; see also Docket # 21-15 at 3-4. On November 2, 2010, Dr. Kavitha Finnity, Ph.D., a licensed clinical psychologist who started treating plaintiff in March or April 2010, sent the Rochester Fire Department a letter stating that plaintiff's symptoms had improved and that he would be able to return to active duty work as a firefighter.[1]

---

[1] According to a report produced by Dr. Singh, Dr. Finnity was unaware of the extent of plaintiff's mental health problems and

Docket # 28-11; see also Docket # 21-15 at 4-5. Shortly after, on November 30, 2010, plaintiff requested an additional fitness for duty examination to see if he could return to work. Docket # 28-12.

On February 10, 2011, Dr. Singh issued a report finding plaintiff unfit to return. Docket # 21-15. The report, which was produced after Dr. Singh interviewed plaintiff, his girlfriend, and his therapist and reviewed plaintiff's records, details his psychiatric history and notes that plaintiff appeared to harbor paranoid delusions against his family and medical staff, among others. Id. at 2-5. Dr. Singh noted that plaintiff's insight into his condition was extremely poor and diagnosed him with: Psychotic Disorder, not otherwise specified; rule out Paranoid Schizophrenia; rule out Schizoaffective Disorder; and hypertension. Id. at 5. Based on the seriousness of plaintiff's mental illness, Dr. Singh determined that plaintiff was unfit for duty and recommended that he "remain under comprehensive psychiatric follow up so that his treatment providers can assess his safety/dangerousness to self and others on an ongoing basis." Id.

On October 15, 2013, plaintiff sent a letter to the City of Rochester, indicating that his physician had certified him fit

---

believed that he only suffered from Post-Traumatic Stress Disorder ("PTSD"). She had not seen records of plaintiff's previous hospitalizations. See Docket # 21-15 at 4.

for duty and requesting to be reinstated pursuant to Civil Service Law section 73. Docket # 21-27. With his letter, plaintiff included a note from Dr. Finnity stating that, if plaintiff continued with psychotherapy and pharmaceutical treatment, he "would most likely have a successful return to work with the Rochester Fire Department." Docket # 21-28. Following his request, plaintiff was again interviewed by Dr. Singh. Docket # 21-29. The report produced by Dr. Singh on February 28, 2014 following his interviews with plaintiff and plaintiff's physician reveals that Dr. Singh had examined plaintiff several times since his February 2011 report. Id. at 3-4. In this report, Dr. Singh noted that plaintiff appeared more understanding of his past mental illness and described plaintiff's Psychotic Disorder and Schizoaffective Disorder as in sustained remission. Id. at 5. Accordingly, Dr. Singh found plaintiff fit for return to full-time line duty work, which plaintiff did on July 21, 2014. Id.; see also Docket # 22 at 6.

Procedural History: Plaintiff first filed a complaint with the New York State Division of Human Rights on September 29, 2009, claiming race, color, and disability discrimination. See Docket # 21-21. On April 29, 2011, plaintiff, plaintiff's girlfriend, Mitrano, and a number of other individuals appeared before an Administrative Law Judge for a hearing on plaintiff's complaint. See Docket # 21-20. The Administrative Law Judge

issued a final order on October 24, 2011, finding that plaintiff
failed to establish racially-motivated discrimination and that
his request for accommodations was unreasonable as a matter of
law and fact.  Docket # 21-23.  The Equal Employment Opportunity
Commission issued a letter adopting the findings of the Division
of Human Rights and providing plaintiff notice of his right to
sue.  See Docket # 1-5.  Accordingly, plaintiff filed his
complaint on February 29, 2012.  Docket # 1.

## DISCUSSION

Presently, defendants move for summary judgment under Rule
56(c) of the Federal Rules of Civil Procedure, alleging that
there is no genuine dispute of material fact between the
parties.  First, they argue that plaintiff has failed to present
sufficient evidence to prove a prima facie case of
discrimination under Title VII of the Civil Rights Act.  Second,
they argue that plaintiff has similarly failed to present
sufficient evidence to prove a prima facie case of
discrimination under the Americans with Disabilities Act ("ADA")
and that, even if this Court finds that he has proven a prima
facie case, his accommodation requests were unreasonable.  See
Docket # 23.  After reviewing the briefs submitted and hearing
arguments from both parties, I find that plaintiff has not
presented sufficient evidence to support an inference of

9

discrimination under Title VII of the Civil Rights Act, but that reasonable minds may differ as to plaintiff's ADA claim.

### I. Summary Judgment Standard

As always, summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, the standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute of fact is material "only if it has some effect on the outcome of the suit." Eagley v. State Farm Ins. Co., 2015 WL 5714402, at *6 (W.D.N.Y. Sept. 29, 2015) (citation and quotation omitted). Moreover, a genuine issue exists as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. When deciding a summary judgment motion, courts must resolve all inferences and ambiguities in favor of the party against whom summary judgment is sought. Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). The

reasonableness of those inferences, though, depends on "the record taken as a whole." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The burden of showing the absence of any issue of material fact rests with the movant. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has established its prima facie entitlement to summary judgment, the burden shifts to the non-moving party to "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admission on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (emphasis added) (internal citations omitted). Put differently, the non-moving party must show that materials cited "establish . . . the presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). It is not enough for the non-movant to present evidence that just raises doubts; the non-movant must present "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" to support the non-moving party's claims is insufficient to defeat a motion for summary judgment. Id. at 252.

In evaluating the merits of a summary judgment motion in the context of a discrimination claim, courts must be cautious

11

in granting relief where the conduct at issue "requires an assessment of individuals' motivations and state of mind . . . ." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001). These are "matters that call for a sparing use of the summary judgment device because of juries' special advantages over judges in this area." Id. (internal quotations and citations omitted). Nevertheless, "the salutary purposes of summary judgment – avoiding protracted, expensive, and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). Ultimately, at this stage, the trial court is limited to "issue-finding," and not resolution, while keeping "in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute." Gallo v. Prudential Residential Serv., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## II. Title VII Discrimination

As a threshold matter, it is necessary to determine exactly how the Court should approach allegations of disparate treatment in violation of federal antidiscrimination statutes absent direct evidence. Traditionally, "[a] plaintiff may prove discrimination indirectly either by meeting the requirements of McDonnell Douglas . . . or by otherwise creating a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 87 (2d Cir. 2015)(internal quotations and citations omitted); see also Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 251 (2d Cir. 2014) (adopting the McDonnell Douglas test for Title VII discrimination claims).

The former, indirect method calls for courts to "analyze Title VII discrimination claims under the now-familiar three-part framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)." Abrams, 764 F.3d at 251. The three-part framework requires first that the plaintiff make out a prima facie case of prohibited discrimination on the part of his prospective, current, or former employer. In McDonnell Douglas, the prima facie case consists of four successive showings:

13

> (i) that [the plaintiff] belongs to a racial minority;
> (ii) that he applied and was qualified for a job for
> which the employer was seeking applicants; (iii) that,
> despite his qualifications, he was rejected; and (iv)
> that, after his rejection, the position remained open
> and the employer continued to seek applicants from
> persons of complainant's qualifications.

411 U.S. at 802.

While the Court in McDonnell Douglas was concerned with an employer's refusal to hire on the basis of alleged racial discrimination, the holding extends to all "unlawful employment practice[s]" outlined by Title VII on any prohibited basis. 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."). Accordingly, a plaintiff can prove a prima facie case of discrimination by demonstrating his "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class." Farias v. Instructional Systems, Inc., 259 F.3d 91, 98 (2d Cir. 2001) (internal citations omitted). Alternatively, the last prong "may be satisfied if the plaintiff can demonstrate that the discharge or adverse employment action

14

occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class." Id. "Showing that an employer treated similarly situated employees differently is a common and especially effective method of establishing a prima facie case of discrimination." Abrams v. Reade, 419 F. Supp. 2d 476, 481 (S.D.N.Y. 2005).

Once the plaintiff has satisfied the first step of the McDonnell Douglas test by making out a prima facie case of disparate treatment, the second step requires that the burden "shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action. McDonnell Douglas, 411 U.S. at 802. However, this second step merely "shifts the burden of production to the defendant." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). Unlike the prima facie case, which the plaintiff must establish by a preponderance of the evidence, "[t]he ultimate burden of persuading the trier of fact" never shifts to the defendant. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the employer offers a nondiscriminatory explanation for the challenged action, the inquiry then shifts back for the third step to the plaintiff, who must "be afforded a fair opportunity to show that [the defendant]'s stated reason . . . was in fact pretext [for a racially-discriminatory decision]." McDonnell Douglas, 411 U.S.

at 804.    The Supreme Court has held that "a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."    St. Mary's Honor Ctr., 509 U.S. at 506 (internal quotations and citations omitted).

**Analysis:** Plaintiff's claim of discrimination under Title VII of the Civil Rights Act fails at every level of the McDonnell Douglas framework.    Before delving into the analysis, though, the Court must flesh out the specific adverse employment actions here.    An adverse employment action is "a materially significant disadvantage with respect to the terms of plaintiff's employment, such as termination of employment, a demotion, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."    Cunningham v. N.Y. State Dep't of Labor, 326 F. App'x 617, 619 (2d Cir. 2009) (internal quotations and citations omitted).    Thus, at a minimum, the adverse employment actions here include: the Fire Department's decision to place plaintiff on unpaid leave on July 1, 2009; the Fire Department's decision not to make the accommodations plaintiff requested; and plaintiff's termination on December 7, 2009.    See Docket # 22.

Applying the McDonnell Douglas shifting-burden analysis to the facts at bar reveals that plaintiff is unable to prove a

16

prima facie case of race-based discrimination.  Though the first
three factors appear undisputed – plaintiff, an African-American
male,  is  a  member  of  a  protected  class;  he  performed
satisfactorily  at  his  job;  and  he  faced  adverse  employment
action - there is no reasonable connection between the adverse
employment  actions  and  any  alleged  discrimination  based  on
plaintiff's race.    See Docket # 30 at 4-5.    While plaintiff
alleges  that  his  co-workers  at  the  Fire  Department  made  -
sometimes  vaguely,  sometimes  openly  –  racist  and  pejorative
comments,[2] see Docket # 28-20 at 1-3, the record as a whole
suggests that none of the alleged instances of racism had any
bearing on the adverse employment actions here.    In fact, they
precede the adverse employment actions by several years or, in
some cases, over a decade.    Id.

       To  be  sure,  plaintiff  has  identified  actual  adverse
employment  actions  that  he  believes  were  motivated  by
defendants' racial animus.    He alleges, for example, that four
non-African-American firefighters with mental disabilities who
requested light-work accommodations received them while he did
not.    Docket # 28-23 at 9.    Assuming, for the sake of argument,
that a reasonable jury finds these facts create an inference of

_____

[2] As noted by defendant, only five of the eleven instances of
alleged  race-based  discrimination  identified  by  plaintiff
occurred after the date he indicated the discrimination began in
his complain.   Docket # 30 at 5-8; Docket # 28-20 at ¶¶ 7-17.

discriminatory employment practices, the burden would then shift to defendants "to articulate some legitimate, nondiscriminatory reason" for its action.   McDonnell Douglas, 411 U.S. at 802. Here, defendants have done that: they note that, according to the recommendations from medical professionals regarding plaintiff's ability to work, "[t]here were explicit conditions, restrictions and monitoring requirements . . . which could not be accommodated in any existing light-duty position within the Fire Department." Docket # 23 at 9.   Moreover, with respect to the four non-African-American firefighters who received light-duty work assignments because of their mental conditions, defendants point out - and plaintiff agrees - that "[n]one of their conditions were at all comparable to [plaintiff's] severe psychiatric disability."[3]  Docket # 30 at 13; see also Docket # 28-23 at 9 ("None of these four firefighters are African-American, and none of their afflictions were of, or compare to, the severe psychiatric nature of the Plaintiff's diagnosis."). This satisfies the defendants' burden "to articulate some legitimate, nondiscriminatory reason" for its action.   McDonnell Douglas, 411 U.S. at 802.

---

[3]  Three of the individuals were placed on light duty for unspecified stress-related mental ailments, and one was placed on light duty for post-traumatic stress disorder.   See Plaintiff's Memorandum of Law (Docket # 28-23) at 9.

Since defendants have satisfied the second portion of the
McDonnel Douglas analysis, the burden returns to plaintiff "to
show that [defendants'] stated reason . . . was in fact pretext
[for a racially-discriminatory decision]." Id. at 804.
Plaintiff has presented no compelling evidence to demonstrate
that defendants made their decisions for reasons other than the
one provided to this Court – that plaintiff required
unreasonable accommodations for his mental impairments to
maintain his position. The absence of such evidence requires
dismissal of his Title VII claim. See Holt v. KMI-Continental,
Inc., 95 F.3d 123, 131 (2d Cir. 1996); see also Goenaga v. March
of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995)
("The party opposing summary judgment may not rely simply on
conclusory statements or on contentions that the affidavits
supporting the motion are not credible, or upon the mere
allegations or denials of the adverse party's pleading."
(internal quotations and citations omitted)). Importantly,
plaintiff has failed to identify a single instance where a
similarly situated, non-African-American employee was granted
light duty work, nor does he demonstrate other instances of
unequal adverse employment actions leveled against him because
of his race. Plaintiff's claim is further belied by his failure
to demonstrate that defendants filled his position with someone

outside his protected class – in fact, it appears that plaintiff has returned to his former position.

Accordingly, defendants' motion for summary judgment with regard to plaintiff's racial discrimination claim under Title VII of the Civil Rights Act is **granted**.

## III. Discrimination under the Americans with Disabilities Act

The ADA prohibits an employer from discriminating against an otherwise qualified individual with a disability because of that disability.  See 42 U.S.C. § 12112(a).  According to the statute, "the term 'discriminate against a qualified individual on the basis of disability' includes

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business.

42 U.S.C. § 12112(b)(5)(A).

"A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a prima facie case." Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998)(citing Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 383 (2d Cir. 1996)).  To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he is disabled within

20

the meaning of the ADA or perceived to be so by his employer;
(3) he was otherwise qualified to perform the essential
functions of his job with or without reasonable accommodation;
and (4) he suffered an adverse employment action because of his
disability. Ryan, 135 F.3d at 869-70. Proving that a plaintiff
is capable of performing his job with a reasonable accommodation
- the third factor - requires its own separate analysis. To
prove a prima facie reasonable accommodation case, "a plaintiff
must show that: '(1) [he has] a disability under the meaning of
the ADA; (2) an employer covered by the statute had notice of
[his] disability; (3) with reasonable accommodation, [he] could
perform the essential functions of the job at issue; and (4) the
employer has refused to make such accommodations.'" Young v.
New York City Dep't of Educ., 2010 WL 2776835, at *7 (S.D.N.Y.
July 13, 2010)(quoting Rodal v. Anesthesia Grp. of Onondaga,
P.C., 369 F.3d 113, 118 (2d Cir. 2004)). Once the plaintiff has
established a prima facie case of disability discrimination,
"the burden of production shifts to the defendant, who must
articulate a legitimate nondiscriminatory reason for its
challenged actions." See Rodal, 369 F.3d at 118 n.3. If such a
reason is offered, the burden returns to the plaintiff to prove
that the defendant's nondiscriminatory explanation is
pretextual. Id.

21

**Analysis:** The crux of defendants' motion for summary judgment on plaintiff's ADA claim centers on reasonable accommodations. Indeed, the parties do not dispute that defendants are subject to the ADA, that plaintiff was disabled within the meaning of the ADA, and that plaintiff suffered an adverse employment action. Instead, defendants assert that plaintiff is unable to point to any temporary light duty positions that he could have filled at the time of the alleged discrimination. See Docket # 23 at 8-11. As a result, defendants claim that they would have had to create a new light-duty position for plaintiff to keep him employed. Id. Plaintiff, for his part, argues that he could have performed light duty work had defendants adopted reasonable accommodations. Specifically, Plaintiff focuses on Dr. Vora's third recommended accommodation – that "[h]is supervisor should be notified that if they notice any change in his behavior, he should be re-evaluated immediately" – and argues that defendants intentionally misinterpreted that accommodation to deny plaintiff employment. See Docket # 28-23 at 5-8. Mitrano, who was in charge of overseeing plaintiff's reapplication process, raised two concerns with this restriction when he denied plaintiff's request to be reinstated: (1) that requiring supervision would lead to a breach in the confidentiality of plaintiff's disability status; and (2) that there were no

22

positions that would allow for "continual and guaranteed" supervision of plaintiff's behavior. See Docket # 28-23 at 6. Plaintiff contends that defendants adopted this false characterization in order to deny plaintiff a reasonable accommodation. As support, plaintiff provides affidavits from himself and James McTiernan, the former Firefighters Union President, which aver that the Fire Department could have effectively monitored plaintiff pursuant to Dr. Vora's recommendations and, thus, provided the accommodations to allow for plaintiff to work. See Docket ## 28-20, 28-21.

The issue here – whether there were reasonable accommodations that would have allowed plaintiff to continue working – presents a mixed question of law and fact. See Carter v. Bennett, 840 F.2d 63, 65 (D.C. Cir. 1988); see also Carter v. Pathfinder Energy Services, Inc., 662 F.3d 1134, 1146 (10th Cir. 2011)("Whether part-time work is a reasonable accommodation under the ADA is a mixed question of law and fact involving primarily legal principles." (internal citations and quotations omitted)). Mixed questions of law and fact are "especially well suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." Mendell v. Greenberg, 927 F.2d 667, 673 (2d Cir. 1990); see also Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997)("Summary judgment is designed to pierce the pleadings

to flush out those cases that are predestined to result in a directed verdict.").

The parties have presented two competing views of the accommodations plaintiff needed to return to work, and neither view is so overwhelmingly persuasive that summary judgment would be appropriate. Indeed, unlike with his Title VII claim, plaintiff has provided declarations from James McTiernan, the former president of the Firefighters Union and a former captain of the Rochester Fire Department, to suggest that plaintiff's requested accommodations were reasonable. See Docket # 28-21. In his statement, McTiernan asserts unequivocally that supervisors within the Fire Department are qualified and capable of supervising employees for changes in their mental health. Id. Defendants can - and certainly do - disagree with McTiernan's assessment, but that does not dissolve this Court of its obligation to construe the facts presented in a light most favorable to plaintiff and weigh the impact these facts would have on a jury's determination. Moreover, the primary inquiry here focuses on Mitrano's "motivations and state of mind" when he denied plaintiff's reapplication for work: plaintiff contends that Mitrano intentionally interpreted the restrictions recommended by Dr. Vora to be more restrictive to deprive plaintiff of his position, and the defendants disagree. This sort of assessment of Mitrano's intentions calls for "sparing

24

use of the summary judgment device because of juries' special advantages over judges in this area." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotations omitted). In short, based on the above and after examining the record, the Court remains unconvinced that reasonable minds would inevitably reach the same conclusion on this issue.

To be sure, plaintiff suffered from serious psychiatric ailments. Dr. Singh observed on multiple occasions that plaintiff appeared delusional and paranoid, and was prone to relapse. The severity of plaintiff's mental impairments and, relatedly, the difficulty defendants would have in finding reasonable accommodations to allow him to remain employed are not lost on the undersigned. Nevertheless, both parties have submitted contradictory evidence on the dispositive points of argument such that the Court finds a genuine issue of material fact remains. Summary judgment is therefore inappropriate. See Gallo, 22 F.3d at 1224 ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them.")

Accordingly, defendants' motion for summary judgment with regard to plaintiff's claim under the Americans with Disabilities Act is **denied**.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment (Docket # 20) is **granted in part** and **denied in part**.

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: September 8, 2016
       Rochester, New York